991 F.2d 797
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Mark E. VREELAND, Plaintiff-Appellant,
v.
James TOWNSEND; Lynn Hardaway; Donald Horvath; Pat
Lauwers; James Gruber; Richard Sweat; Vincent Burkey;
Daniel Bellino; Michael Murphy; William Frey; Monroe
County Central Dispatch; and Monroe County Prosecutor's
Office, Defendants-Appellees,
Walter Trobridge, et al., Defendants.
 No. 92-1534.
 United States Court of Appeals, Sixth Circuit.
 April 14, 1993.
 
 Before MERRITT, Chief Judge, and BOGGS and BATCHELDER, Circuit Judges.
 PER CURIAM:
 
 
 1
 Mark Vreeland sued the defendants[1] under 42 U.S.C. § 1983, alleging that his constitutional rights were violated when he was insulted by Monroe County dispatchers, shot and arrested by Monroe County deputies, prosecuted by the Monroe County Prosecutor, and jailed when all the defendants allegedly should have known that Vreeland suffered from an unspecified "mental illness." Vreeland also brought several state law claims based on the same conduct. The district court granted the defendants' motions for summary judgment for failure to state a claim and dismissed all claims with prejudice. Vreeland now appeals that dismissal. We affirm.
 
 
 2
 * On April 23, 1988, Vreeland, after drinking heavily, made a series of phone calls from his residence in Monroe, Michigan to the Monroe County Dispatch on the "911" emergency line. Vreeland made approximately twenty calls between 1:30 a.m. and 1:53 a.m. and continued to call the dispatch until 3:00 a.m. At first, Vreeland told the dispatchers that he was possessed and that he was a werewolf. He identified himself by name and revealed his social security number, but refused to reveal where he lived. In other calls, Vreeland growled into the phone, breathed heavily, simulated missile sounds, commented on Israel's military capabilities, expressed concern about the safety of his mother, threatened to kill his mother, himself, or one of the dispatchers, expressed doubts about his own mental health, informed the dispatchers that "crack and aids is winning," traded insults with the dispatchers, muttered incomprehensibly, or simply abruptly hung up the phone. Over time, the dispatchers became frustrated. They insulted Vreeland, used profanity, and made disparaging remarks about his sexual orientation and cowardice.
 
 
 3
 One dispatcher asked Deputy Bellino to check out plaintiff's residence and investigate the possibility of taking him into custody. At 3:10 a.m., Bill Younglove, who lived with Vreeland, called 911 to request that a car be dispatched to his residence. Younglove reported that Vreeland had just left the residence, was possibly armed, and that he feared Vreeland might kill his own mother.
 
 
 4
 At 3:15 a.m., Deputy Bellino, while cruising in his patrol car near Vreeland's residence, spotted a man with a shotgun in one hand and a beer in the other. After the man pointed the shotgun at Bellino and yelled, "I'm evil and I'm going to kill you," Bellino correctly surmised that the man was Vreeland. Bellino turned off his lights, backed away, and called for backup. Vreeland continued to approach Bellino, still brandishing the shotgun and repeating over and over, "I am evil and I'm going to kill you." Bellino warned Vreeland ten to fifteen times and even tried calling him by name and reasoning with him, but Vreeland continued to threaten him.
 
 
 5
 Deputies Richard Sweat and Vincent Burkey arrived in a patrol car, pulling up close to Vreeland. The deputies took cover behind their patrol cars and attempted to persuade Vreeland to put his gun down. Vreeland replied that they would have to shoot him and continued to walk closer to Bellino. Several times Vreeland motioned as if he were firing the shotgun. Bellino reported that he fired a warning shot, but Vreeland kept coming forward and taunting the deputies. When Vreeland was about twenty feet away, Bellino shot him in the arm. Vreeland dropped the gun and fell to the ground. Vreeland was taken to the hospital in an ambulance.
 
 
 6
 On April 26, 1988, Monroe County Prosecuting Attorney Frey authorized issuance of a warrant for Vreeland's arrest on three felony counts. Vreeland eventually entered a plea of no contest to a misdemeanor charge of attempted assault, pursuant to a plea bargain.
 
 
 7
 In his complaint, Vreeland characterizes his barrage of phone calls to the dispatch as a plea for help by someone suffering from an unspecified mental illness. Vreeland alleges that the four dispatchers--Townsend, Hardaway, Lauwers, and Gruber--defamed and ridiculed him, and exacerbated his confusion and distress, thus destroying his self-esteem and prompting him to take self-destructive, even suicidal, actions such as taunting and threatening the deputies. He also claims that their insults amounted to libel, slander, and intentional infliction of emotional distress. Vreeland alleges that Horvath, the dispatchers' supervisor, is responsible for the dispatchers' unprofessional conduct.
 
 
 8
 Vreeland alleges that Deputies Sweat and Burkey encouraged his self-destructive behavior and committed assault and battery by almost hitting him with their patrol car. Vreeland alleges that Deputy Bellino used excessive force by shooting him. Finally, Vreeland alleges that Prosecuting Attorney Frey maliciously prosecuted him on the felony charge of assault with a dangerous weapon.
 
 
 9
 The defendants moved for summary judgment, claiming that Vreeland has failed to state a claim against Monroe County because he has failed to identify a policy, custom, or practice upon which the individuals acted and he failed to establish that the dispatchers were inadequately trained; that Prosecuting Attorney Frey is entitled to absolute immunity; that Vreeland has failed to state a constitutional claim against the individual dispatchers because he has not established a special relationship between them and Vreeland; and that the deputies are entitled to qualified immunity.
 
 
 10
 The district court granted the motions and dismissed both the federal and state claims with prejudice.[2] The district court also determined that any appeal from its decision would be frivolous and not in good faith and thus ruled that, pursuant to 28 U.S.C. § 1915(a), an appeal could not be taken in forma pauperis. Undeterred, Vreeland's counsel pressed forward and now challenges the dismissal of all federal and state claims and the denial of a motion to conduct further discovery.
 
 II
 
 11
 We review de novo the district court's grant of the defendants' motions for summary judgment. Baggs v. Eagle-Picher Industries, Inc., 957 F.2d 268, 271 (6th Cir.1992). We can affirm the district court only if we determine that the pleadings, affidavits, and other submissions show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 
 12
 The moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only "show[ ]--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The pivotal question before us is whether Vreeland, the party bearing the burden of proof, has presented a jury question as to each element of his case. Id. at 322. Vreeland must present more than a mere scintilla of evidence in support of his position; he "must present evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).
 
 III
 
 13
 * To prevail in a § 1983 action, a plaintiff must show that the conduct complained of was committed by a person acting under the color of state law and that the conduct deprived the plaintiff of rights, privileges, or immunities guaranteed by the Constitution or federal statutes. 42 U.S.C. § 1983; see Parratt v. Taylor, 451 U.S. 527 (1981). The defendants concede that they were acting under the color of state law, but contend that their conduct did not deprive Vreeland of any constitutional or federal statutory rights. On a more fundamental level, Vreeland's § 1983 claim is deficient because he failed to identify with specificity the constitutional right that was allegedly violated. In Wells v. Brown, 891 F.2d 591 (6th Cir.1989), this court held that plaintiffs seeking damages under § 1983 must set forth clearly in their pleadings the capacity in which they are suing the defendants. Vreeland's pleading is seriously deficient. No actions of specific defendants are tied to specific constitutional or statutory rights. In fact, no particular constitutional provision or statute is even mentioned at all. As Vreeland's counsel candidly admits, "Plaintiff was represented by the only attorney that he could get, an attorney unfamiliar with the complexities of Section 1981 actions." Appellant's Brief, at v (emphasis added). Although we could affirm the district court's dismissal of the federal claims on this ground alone, we briefly address Vreeland's § 1983 claims against each defendant.
 
 B
 
 14
 Prosecutor Frey is unquestionably entitled to absolute immunity because he was sued for conduct within the scope of his prosecutorial duties, prosecuting Vreeland for assault with a dangerous weapon. Imbler v. Pachtman, 424 U.S. 409, 420 (1976).
 
 C
 
 15
 Dispatchers Townsend, Hardaway, Lauwers, and Gruber may have acted negligently and unprofessionally in dealing with Vreeland, but mere negligence is not enough to constitute a § 1983 violation. Davidson v. Cannon, 474 U.S. 344 (1986). In Nishiyama v. Dickson County, Tenn., 814 F.2d 277, 282 (6th Cir.1987), this court stated:
 
 
 16
 In our view, a person may be said to act in such a way as to trigger a Section 1983 claim if he intentionally does something unreasonable with disregard to a known risk or a risk so obvious that he must be assumed to have been aware of it, and of a magnitude such that it is highly probable that harm will follow.
 
 
 17
 The only clear risk that was made known to the dispatchers was the threat that Vreeland might kill his mother. Although the dispatchers insulted Vreeland and engaged in needless bickering, they also ascertained Vreeland's address and his mother's address and acted to prevent the risk by notifying Deputy Bellino.
 
 
 18
 Finally, this is not a case where the state actors owed an affirmative duty of care to the plaintiff. Such cases only arise when "the affirmative exercise of [the state's] power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs, e.g., food, clothing, shelter, medical care, and reasonable safety...." Reeves by Jones v. Besonen, 754 F.Supp. 1135, 1140 (E.D.Mich.1991) (citing Deshaney v. Winnebago County Dept. of Social Services, 489 U.S. 189 (1989)). Vreeland voluntarily called and harassed the dispatchers, and he chose to confront the deputies with shotgun in hand.
 
 D
 
 19
 Vreeland claims that the deputies used excessive force in effectuating his arrest. In Graham v. Connor, 490 U.S. 386, 388 (1989), the Supreme Court held that excessive force claims are to be analyzed under the "objective reasonableness" standard of the Fourth Amendment rather than under a substantive due process standard. The deputies claim an affirmative defense of qualified immunity. Under the doctrine of qualified immunity, government officials performing discretionary duties "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Thus, a defendant has qualified immunity unless the plaintiff's "rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have understood that he was under an affirmative duty to have refrained from such conduct." Dominique v. Telb, 831 F.2d 673, 676 (6th Cir.1987).
 
 
 20
 Vreeland was drunk, brandishing a shotgun, claiming that he was so evil that he had to be eradicated, and threatening and taunting the deputies. Before Deputy Bellino shot Vreeland, he gave him ten to fifteen verbal warnings, attempted to reason with him, fired a warning shot, and waited until Vreeland was approximately twenty feet away, still approaching, and still making threats. The deputies are clearly entitled to qualified immunity.
 
 
 21
 Vreeland's claim that Sergeant Townsend inadequately trained Deputy Bellino fails for the same reasons that his claim of inadequate training of the dispatchers fails, as discussed in the following section.
 
 E
 
 22
 Vreeland did not name Monroe County as a defendant, but the claims against the Monroe County Dispatch and the Monroe County Prosecutor's Office--neither of which is amenable to suit--are best interpreted as claims against Monroe County. Even under this liberal interpretation of the pleading, Vreeland has failed to establish a § 1983 claim against Monroe County.
 
 
 23
 First, Monroe County cannot be subjected to liability unless the allegedly unconstitutional act is linked to a policy, custom or practice. Monell v. Department of Social Services, 436 U.S. 658, 690 (1978). Vreeland simply has not cited any policy, ordinance, or regulation. Vreeland has merely alleged that Horvath, the dispatch supervisor, is responsible for the actions of the dispatchers whom he supervises. However, liability under § 1983 cannot be established on the basis of respondeat superior. Rizzo v. Goode, 423 U.S. 362 (1976). Vreeland must show:
 
 
 24
 ... that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.
 
 
 25
 Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir.), cert. denied, 469 U.S. 845 (1984).
 
 
 26
 The dispatchers may have acted unprofessionally by stooping to Vreeland's level and trading insults. However, there is no evidence that the dispatchers were following a policy, custom, or practice of Monroe County. Vreeland's only evidence is that more than one dispatcher engaged in the questionable exchanges with him. This evidence, standing alone, does not constitute a pattern.
 
 
 27
 Vreeland's only specific allegation, other than a "respondeat superior" theory, is that Monroe County inadequately trained the dispatchers. Inadequate training may serve as the basis for § 1983 liability only when the failure to train amounts to deliberate indifference to the rights of persons with whom the municipality's employees come in contact. City of Canton v. Harris, 489 U.S. 378, 388 (1989). Vreeland's only evidence of inadequate training is an affidavit from a retired Toledo police officer with experience as a "911" dispatcher, in which the officer stated that the defendant dispatchers' conduct was inconsistent with standard operating procedure. However, this does not reveal anything about the training program. It only shows that the dispatchers may have performed as if they were inadequately trained in this specific incident. The officer did not even hypothesize that inadequate training was the moving force causing the alleged deprivation of Vreeland's rights. See id. at 391 (plaintiff must prove that the deficiency in training actually caused the ultimate injury). To the contrary, the retired officer stated more than once in his deposition that he thought that the dispatchers intentionally departed from standard operating procedure.
 
 IV
 
 28
 Vreeland also brought state law claims: assault and battery against the deputies, and intentional infliction of emotional distress, libel, and slander against the dispatchers. The district court properly dismissed these state law claims with prejudice. First, Vreeland claims that by driving their patrol car very close to him Deputies Sweat and Burkey committed assault and battery. Battery requires unlawful touching, Espinoza v. Thomas, 472 N.W.2d 16, 21 (Mich.App.1991), and Vreeland has not alleged any contact by these defendants. Second, the deputies claim they are immune from the assault claim pursuant to M.C.L.A. § 691.1407. Vreeland never responded to the defendants' claims of immunity on this point, and there is no evidence in the record that raises a genuine issue of fact material to this claim. Third, the dispatchers' conduct may have been inappropriate and unprofessional, but it does not rise to the level of intentional infliction of emotional distress. See Tope v. Howe 445 N.W.2d 452, 460 (Mich.App.1989) ("Liability does not extend to mere insults, indignities, threats, annoyances, petty offenses and other trivialities."). Finally, Vreeland's allegations of libel and slander are frivolous. Vreeland has not specified which statements are untrue; nor has he explained how the dispatchers caused the statements to be published by the local media.
 
 V
 
 29
 Finally, we hold that the district court did not abuse its discretion by denying Vreeland's motion to conduct further discovery under Rule 56(f) of the Federal Rules of Civil Procedure. See York v. Tennessee Crushed Stone Association, 684 F.2d 360, 363 (6th Cir.1982). We agree with the district court's summation: "To request an extension of time to take depositions now when he could have taken them during the past year and a half offends the discovery process."
 
 VI
 
 30
 For the foregoing reasons, we AFFIRM the district court's dismissal of Vreeland's federal and state claims with prejudice.
 
 
 
 [1]
 Defendants Townsend, Hardaway, Lauwers, Horvath, and Gruber are "911" operators for the Monroe County Dispatch. Defendants Bellino, Sweat, and Burkey are Monroe County Sheriff's Deputies. Defendant Frey is the Monroe County Prosecuting Attorney. Vreeland also named the Monroe County Dispatch and the Monroe County Prosecutor's Office as defendants. However, these offices are not separate entities amenable to suit, pursuant to Rule 21, Fed.R.Civ.P. Vreeland did not name Monroe County as a defendant
 
 
 [2]
 Vreeland was a resident of Ohio at the time of his arrest; therefore, the district court had diversity jurisdiction over the state claims